IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DONALD BREEDLOVE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 7:19cv210 |
| ) | |
| BANKERS LIFE AND CASUALTY CO., ) | |
| CNO SERVICES, LLC, and ) | |
| JENNIFER SWEDENBURG, ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT

Donald Breedlove, (the plaintiff) files this Complaint against Bankers Life and Casualty Company, CNO Services, LLC, and Jennifer Swedenburg, (the defendants) and in support thereof, states as follows:

## BACKGROUND

1. Bankers Life & Casualty Company is an insurance company licensed to provide services in the Commonwealth of Virginia, with a hometown office located at 5115 Bernard Dr., Suite 305, Roanoke, Virginia 24018.

2. Bankers Life and Casualty Company, operates with and under a partnership agreement with CNO Services, LLC doing business at a Roanoke, Virginia hometown office at the above address.

3. Bankers Life and Casualty Company has a license to transact the business of insurance in the Commonwealth of Virginia since 1947.

4. CNO Services LLC manages operations of Bankers Life and Casualty Company in accordance with a management agreement, and at all times relevant hereto, employed



1

individuals whose job entailed training, supervising, and disciplining employees of Bankers Life, like Jennifer Swedenburg ("Swedenburg") in Roanoke Virginia.

5. The above corporate defendants, Bankers Life and Casualty Company, and CNO Services, LLC shall be referenced herein as "Bankers Life."

6. Swedenburg was an agent of Bankers Life from 2014 to 2015 working out of their Evansville, Indiana office.

7. In 2016, Swedenburg became an employee of Bankers Life and worked out of their Roanoke, Virginia office as a Unit Field Trainer for most of 2016.

8. Prior to serving as an agent with Bankers Life, Swedenburg had no background in insurance and no training in insurance.

9. Her training in how to sell insurance products was conducted by Bankers Life agents and employees Scott Cole, Bill Baylog, and Kyle Elliott; all of whom remain employed by Bankers Life.

10. While in the Evansville office in 2015, Swedenburg was 100% commission based in her compensation and was licensed to sell life insurance, Medicare supplements, long term and short term care insurance, and some annuities.

11. She was not serving as a financial planner or advisor through Bankers Life.

12. In or around January 2016, Swedenburg was offered a promotion by Scott Cole ("Cole"), then regional director of Bankers Life in Greensboro, North Carolina, with the duty to oversee the Roanoke, Virginia office.

13. Swedenburg accepted the position as an employee in the Roanoke, Virginia office as a Unit Field Trainer.



14. As a Unit Field Trainer, Swedenburg had the job of daily management for the Roanoke office, selling policies to prospective and existing clients, all while training new independent contractors, called agents, who were newly recruited to the Roanoke office.

15. Swedenburg's compensation as a Unit Field Trainer was again based primarily on her sales and the sales of the agents underneath her in the Roanoke office.

16. In 2015/2016, Swedenburg trained and supervised as many as fifteen agents at any one time.

17. During this period, the agents Swedenburg supervised were compensated solely on commission and encouraged by the Bankers Life defendants to sell as many accident, life, sickness, long term care, Medicare supplement, and other general insurance policies to individuals in and around Southwest Virginia.

18. In 2016, Swedenburg was the highest performing Unit Field Trainer in the Roanoke, Greensboro, and Winston-Salem offices of Bankers Life.

19. Her sales numbers were considerably higher than any other Unit Field Trainers in the region.

20. During this time, her supervisor, Scott Cole offered to purchase a home at his expense, so Swedenburg could live either at cost or rent free, so long as she continued to meet her monthly sales goals.

21. Cole was very pleased with her success and, as his compensation was also based on his employee's sales, he too financially benefited from Swedenburg's success with Bankers Life.

22. In 2016, Bankers Life defendants serviced over $20,000,000.00 in premiums for accident and sickness insurance across the Commonwealth of Virginia.



23. In 2016, Swedenburg made over $130,000 selling insurance products in and around Roanoke Virginia.

## TRAINING

24. Bankers Life agents and employees were given access to local Medicare recipients' names and numbers and encouraged to cold call these senior adults for the purpose of selling them insurance policies.

25. In training, Swedenburg and other Bankers Life agents were taught to state the first meeting with a perspective client would be one about m*edical education*, offering insight to Medicare supplement plans and other insurance products.

26. Specifically, Swedenburg trained her agents to tell callers they were from the "senior education division of Bankers Life," and that they wanted to come tell them about changes to Medicare.

27. During the sales call, agents were taught to focus on education and client's needs in order to get them to agree to an in-person meeting.

28. The tag line taught to Swedenburg and other Roanoke agents was "get in the door on education."

29. Once in the door, Bankers' Life encouraged their agents and field trainers to sell policies.

30. The first step to selling was to undertake a fact finding mission to see what Bankers Life products could be sold to the individual.

31. In addition, Swedenburg was trained to take a check from prospective clients during the first meeting, even if they were not sure they wanted to apply for a policy.

32. Swedenburg would tell clients the check was needed to get a quote or to see what rates could be calculated for the client.

4

33. Although she was trained to submit the check with the original application for insurance, Swedenburg would often hold checks for weeks or months before submitting them to the home office.

34. This practice was condemned by the home office and yet Swedenburg continued to hold checks throughout her employment to engender trust with the clients who might not yet have agreed to purchase a policy.

35. Bankers Life encouraged their agents and employees to use various terms of art to describe the products being offered. For example, employees were discouraged from using the phrases "short term care" or "convalescent care" insurance, and were encouraged to refer to the product as "extended care."

36. Bankers Life trained their agents that short term care and long term care are nearly identical products.

37. Agents like Swedenburg were trained by Bankers Life to make existing policies look bad, so that potential clients would want to purchase new policies with Bankers Life.

38. The intent of using this misleading and confusing terminology was to imply the product provided longer coverage than it did.

39. Bankers Life trained agents to describe short term care and long term care as similar products.

40. Swedenburg would often tell clients the products were almost the same, and tell clients to "max out" a short term care policy, implying it would provide the same or similar benefits to a long term care policy.

41. Swedenburg was trained by Bankers Life to sell life insurance policies and to highlight parts of the policies to make it appear that had certain benefits, such as guaranteed

interested of 4.5% and the ability to remove money, penalty free, to pay for items the client would need.

42. Throughout her training at Bankers Life, employees such as Scott Cole and Kyle Elliott taught Swedenburg how to cut corners and highlight certain product features to promote sales.

43. For example, both in Indiana and Virginia, Swedenburg witnessed Cole taking internal product exams for agents so they could pass the Bankers Life license exams and go sell products, likely before they were fully trained on the product.

44. Elliott and Cole taught Swedenburg to try to replace any existing policies potential clients had with Bankers Life policies – even if that meant replacing good and useful policies with less useful Bankers Life ones.

45. During a September 2016 investigation conducted by Bankers Life into Swedenburg's unethical conduct, Swedenburg told Bankers Life she felt she had not been properly trained on company policies and procedures.

46. Subsequent investigations conducted by Bankers Life into Swedenburg's conduct revealed that between 14 and 18 clients felt Swedenburg had misrepresented the nature of the product purchased, the benefits, or worse, she had purchased products on behalf of clients that had not agreed to the sale.

47. Swedenburg was taught by Cole and Elliott, and trained her agents, not to complete E-applications for policies in the presence of clients, as required by law and Bankers Life policies, but rather complete the applications later outside the presence of clients.

48. This meant that clients were not made aware of policy details, application questions, and information sought by Bankers Life until after the policies had been applied for and approved.



6

## COMPANY CULTURE

49. Bankers Life takes pride on hiring insurance agents with no professional experience and/or ties to the insurance industry.

50. Swedenburg was recruited by Bankers Life and encouraged by her Bankers Life recruiters to drop out of college to further pursue a career with Bankers Life.

51. Kyle Elliott, one-time supervisor and trainer of Swedenburg, praised Swedenburg for her work ethic and that she was very trainable and teachable.

52. The company culture during Swedenburg's time as agent and employee put a significant amount of time and emphasis on sales and rewards for sales.

53. Bankers Life instructed their employees and agents to set at least seven appointments a day with prospective clients and to file at least 15 applications a month.

54. High performers were awarded with lavish trips, bonuses, meals, social outings and other perks from Bankers Life.

55. If an agent did not meet his or her goals, he/she would be left behind in the office while others went out to celebrate their financial success.

56. The Roanoke office was, during all times relevant, managed by Cole who largely put professional and public emphasis on sales training and applauding agent bonuses.

57. Cole spent very little time training staff on the substance of products or policies themselves.

58. The Roanoke office's social media accounts reflects employees and agents receiving large cardboard checks, lavish trips, meals, and outings for employees.

59. The Roanoke office, under Cole and Swedenburg, violated a number of



Banker's Life policies: such as allowing supervisors to take product exams for agents, allowing unlicensed agents to go into customer's homes, allowing policies to sit undelivered past the free look period, hiring felons, and more.

60. Agents, including Swedenburg, were taught by Bankers Life employees and trainers various deceptive practices to increase sales, such as:

   a. Changing policy issue dates to match and maximize quarterly bonus cycles;

   b. Paying for client premiums themselves until they could convince or encourage the client they needed the policy;

   c. Encouraging prospective clients to cancel existing policies with other companies, that provided good benefits to the client, in order to write new policies with Bankers Life;

   d. Sharing commissions with agents not involved in the sale of policy;

   e. Not explaining the negative aspects of policies including limited duration of policies, fees or penalties in cancelling various policies, etc.

61. In addition to the deceptive sales practices enumerated above, Swedenburg personally used the following tactics to increase the number of policies written and sold on behalf of defendants Bankers Life:

   a. Failing to explain "look back" periods;

   b. Applying for policies without the client's permission or consent;

   c. Misrepresenting the products being sold to clients on written documents such as forms, agenda sheets, etc.;

   d. Removing pages from policies once delivered to clients so the misrepresentations made would not be obvious to the clients;

   e. Falsifying dates of birth and other health information so that clients would qualify for policies they would not otherwise be entitled to absent the falsifications;



8

    f.        Forging client's initials and signatures on paper policies, changes, and electronic policies.

    g.        Writing clients personal checks;

    h.        Stating long term care is similar to short term care; and

    i.        Selling policies to clients who didn't benefit from the policy.

62. Swedenburg did not hide these actions from her agents or supervisor Cole because she believed them at the time to be acceptable actions within the company culture.

## PLAINIFF

63. In or around late 2015, an agent under Swedenburg and Cole named Suzette Laratta called longtime Bankers Life customer Donald Breedlove to see how she could service his existing long term care policy, originally purchased from Bankers Life in or around 2004.

64. Laratta made an appointment with the plaintiff and his wife and came to the house to discuss whether he had any additional needs.

65. When the plaintiff had additional questions Laratta could not answer, she promised to return to the home with her manager Jennifer Swedenburg.

66. During the initial visits, Swedenburg indicated that in addition to his existing long term care policies, Mr. and Mrs. Breedlove would need short term care policies implying that their long term care policy wouldn't start until 100 days after he needed treatment.

67. Further, Swedenburg indicated that Mr. Breedlove needed additional coverage because his long standing policy didn't have inflation protection, low daily maximum and other reasons.

68. In addition Swedenburg discussed purchasing an annuity or life insurance policy that would earn guaranteed interest, and that interest could be used to pay for the new short term



9

care policy they were recommending. See Exhibit A attached, Agenda created during the meeting.

69. Swedenburg returned to plaintiff's home a number of times alone, pushing the additional short term care policy.

70. Upon information and belief, Swedenburg misrepresented the need and nature of the short term care policy to Mr. Breedlove and his wife who also had a pre-existing long term care policy.

71. Specifically, Swedenburg represented it would fill in the gap not covered by Mr. Breedlove's existing policy, that the terms were better (because of the inflation provision), and then Swedenburg represented to Mr. Breedlove he could max out the short term care policy and it would give him up to three years of coverage.

72. Mr. Breedlove and Mrs. Breedlove relied on Swedenburg and purchased the policies in December 2015.

73. Swedenburg delivered portions of these policies to the Breedloves in early 2016.

74. Later in 2016, during additional meetings, Swedenburg convinced both of the Breedloves to cancel their long term care policies they had been paying for over twelve years, claiming the short term policies she sold them were similar.

75. Upon the advice of Swedenburg, the Breedloves cancelled their existing long term care policies in June of 2016.

76. In early 2017, Swedenburg encouraged Mr. Breedlove to purchase a whole life insurance policy from Bankers Life.

77. The application however, was not submitted until after Swedenburg was fired in March 2017.



78. Plaintiff does not know who submitted the policy as his main contact was Swedenburg and he was not formed of her termination when it occurred.

79. Throughout their meetings, Swedenburg represented to the Breedloves that the policies they purchased had certain qualities which the Breedloves now know to be untrue.

80. For example, Swedenburg indicated an annuity would give Breedloves monthly income and ability to withdraw money penalty free.

81. Swedenburg indicated the life insurance policy would have guaranteed interest of 4.5%.

82. Only upon learning of her firing, did the Breedloves begin to realize much of Swedenburg's behavior had been odd and likely unethical. For example, the following occurred during their interactions:

   a. Upon further review and during this litigation, Mr. Breedlove observed that various pages had been removed from the Policies provided by Swedenburg and Bankers Life.
   b. In addition, various benefits were highlighted in the policies which the plaintiff realizes were not benefits at all.
   c. At one point, Mrs. Breedlove called Swedenburg and asked to remove an amount of money from the newly purchased annuity because they wanted to pre-pay their burial expenses.
   d. Swedenburg indicated to the Breedloves the money was there, but it would be a nightmare of paperwork to get the money – but she (Swedenburg) would write them a personal check for the amount and they could just pay her back later.
   e. Swedenburg even went on and cut the Breedloves a check, which they did not cash.
   f. At one point, Swedenburg called the plaintiff and asked him for a ride to the hospital. He refused and told her to call 911; and
   g. Swedenburg would often tell the Breedloves they were like family, and how much she appreciated their friendship.

83. After Swedenburg was fired from Bankers Life, the Breedloves learned the short term care policies they had been sold did not have the three year benefit as Swedenburg explained, rather, a very limited benefit less than one year.



84. The Breedloves lost a daughter to a criminal act many years ago and their grandchildren are being raised by their son and his wife.

85. It was very important for the Breedloves to have long term care coverage such that they didn't want to place any additional burden on their son or his family should they become ill.

86. Mr. Breedlove complained to Bankers Life corporate who re-wrote his long term care insurance and refunded $1200.

87. However, Mr. Breedlove was not fully compensated for the time and money spent on purchasing the unnecessary short term care policies, as well as the life insurance policy that does not provide the benefits he requested.

88. Now, Mr. Breedlove maintains insurance with a company he no longer trusts, has money tied up in a whole life policy he would like back.

## COUNT I – FRAUD - ALL DEFENDANTS

89. The plaintiff repeats and realleges each and every allegation contained above.

90. In their dealings with the plaintiff, the defendants intentionally and knowingly made false representations of present, material facts as follows:

    a. The type of insurance being offered; and
    b. The nature and extent of coverage under the Bankers Life insurance plans.

91. The plaintiff reasonably relied on the defendants' above referenced fraudulent misrepresentations that resulted in damage to the plaintiff.

92. Bankers Life trained Swedenburg to engage in the following fraudulent actions:

    a. Intentional misrepresentations between short term care and long term care;
    b. Policy application completion outside the presence of the client;
    c. Policy date re-issuance (to maximize agent bonus potential); and
    d. Misrepresentations on applications and policy benefits.



93. The plaintiff relied upon the above misrepresentations and as such, suffered significant financial harm.

94. The plaintiff suffered damages in the form of funds expended for a Bankers insurance policy that was of no use to him (the short term care policy).

95. Further, the plaintiff has a life insurance plan that does not have the benefits as explained.

96. When Mr. Breedlove requires long term care, the family will have make claim to a company that has already lost their trust.

97. As a result of the defendants' fraud, the plaintiff has suffered and will continue to suffer financial loss.

## COUNT II – CONSTRUCTIVE FRAUD – ALL DEFENDANTS

98. The plaintiff repeats and realleges each and every allegation contained above.

99. In their dealings with the plaintiff, the defendants misrepresented present, material facts as follows:

   a. The type of insurance being offered; and
   b. The nature and extent of coverage under the Bankers Life insurance plan.

100. The plaintiff reasonably relied on the defendants' above referenced fraudulent misrepresentations that resulted in damage to the plaintiff.

101. The plaintiff suffered damages in the form of funds expended for a Bankers insurance policy that was of no use to him.

102. Further, the plaintiff purchased a life insurance policy that does not have the benefits offered, such as a guaranteed 4.5% interest.

103. As a result of the defendants' constructive fraud, the plaintiff has suffered and will continue to suffer financial loss.

## COUNT III – NEGLIGENCE *PER SE* – BANKERS LIFE



104. The foregoing paragraphs are incorporated by reference.

105. The Virginia Administrative Code 14 VAC 5-200-10, on long term care insurance, states in relevant part: This chapter is designed to: (1) promote the public interest; (2) promote the availability of long term care insurance coverage; (3) protect applications for long term care insurance from unfair or deceptive sales or enrollment practices; and (4) promote flexibility and innovation in the development of long term care Insurance.

106. The plaintiff, as a consumers of long term care insurance, was the type of person the long term care code section was enacted to protect.

107. Section 14 VAC 5-200-170(A) establishes standards for insurance companies, requiring companies like Bankers Life, to:

(A)1. Establish marketing procedures to assure that any comparison of policies by its agents will be fair and accurate; 2. Establish marketing procedures to assure excessive insurance is not sold or issued.

108. Section 14 VAC 5-200-170(B) prohibits insurance companies, like Bankers Life from:

(B)1. Twisting. Making any misleading representation or incomplete or fraudulent comparison of any insurance policies or insurers for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, pledge, assign, borrow on or convert any insurance policy or to take out a policy of insurance with another insurer.
2. High pressure tactics. Employing any method of marketing having the effect of or tending to induce the purchase of insurance through force, fright, threat, whether explicit or implied or undue pressure to purchase or recommend the purchase of insurance.
3. Cold lead advertising. Making use directly or indirectly of any method of marketing which fails to disclose in a conspicuous manner that a purpose of the method of marketing is solicitation of insurance and that contact will be made by an insurance agent or insurance company.

109. In training, Swedenburg and other agents were taught to tell callers they just wanted to educate them about their Medicare options.

110. Then, Bankers Life training indicated that once in the door, agents were push products not education.



111. Further, they were trained to infer that short term care and long term care are very similar products.

112. These sales tactics, created and taught by Bankers Life to their agents and employees, violated the above sections of the Virginia Administrative Code.

113. Further, by encouraging agents to use ambiguous and confusing terms like "extended care" instead of clear terms of art like short term or convalescent care, Bankers Life violated the above sections of the Virginia Administrative Code.

114. By teaching agents to use negative consequence questions, Bankers Life trained agents to use high pressure tactics in violation of the Virginia Administrative Code as enumerated above.

115. By teaching agents like Swedenburg to downplay the difference between existing policies maintained by the plaintiff, the one being offered by Bankers Life, Bankers Life violated the above sections of the Virginia Administrative Code.

116. In addition, the defendants were obligated to comply with Virginia Administrative Code regarding the marketing, sale and offering of Accident and Sickness insurance (even if the misrepresented the policy as long term care, and not accident and sickness insurance).

117. The defendants failed to comply with 14 VAC5-140-80-B1 by failing to obtain the plaintiff's signature and agreement on the limited benefit policy.

118. The plaintiff's electronic signature, and initials on the short term care application and life insurance application were not his own. The signature is therefore forged, and does not meet the requirements under the Administrative Code.

119. The defendants failed to comply with Virginia Administrative Code.

120. The aforesaid acts of and/or omissions by the defendants constitute negligence *per se*.

121. The above misrepresentations and improper marketing tactics taught by Bankers Life were violations of the <u>Virginia Administrative Code,</u> and committed by the defendants in a reckless, consciously indifferent, or intentional manner to solicit business from the plaintiff and other unknowing Virginians.

122. As a result of the aforesaid acts of and/or omissions by the defendants, the plaintiff sustained damages, the particulars of which have been set forth above.

<u>COUNT IV – GROSS NEGLIGENCE / PUNITIVE DAMAGES – ALL DEFENDANTS</u>

123. Plaintiff repeats and realleges each and every allegation contained above.

124. The defendants were on notice that injuries occur when clients are not honestly informed about the nature of insurance products being offered.

125. Further, the defendants were on notice and had been censured by the Commonwealth of Virginia Bureau of Insurance for sharp marketing practices, misrepresentations, and failure to follow state and federal insurance guidelines in the past.

126. The defendants knew that the plaintiff had paid almost 12 years on a substantial long term care policy.

127. Despite knowledge of this, the defendants boldly and purposefully lied to the plaintiff about the nature of his original policy, and the short term care policy being offered.

128. Further, they removed policy pages and failed to disclose the actual nature of the product being sold.

129. The defendants' purposeful fraud, misrepresentation, and sharp dealing is reprehensible.

130. Such actions were intentional and/or with reckless disregard for the consequences to the plaintiff.



131. Bankers Life, through their corporate management staff, training, compensation model and aggressive marketing tactics, were well aware of widespread deficiencies in offerings to customers like the plaintiff and yet did nothing to remedy or prevent its reoccurrence.

132. Defendants ratified their employees' conduct by failing to correct or institute policies that would prevent the reoccurrence of such injuries, until state police became involved.

133. Such actions were taken with reckless indifference to the consequences.

134. The defendants, through their management staff, committed direct acts of willful, wanton, and reckless conduct that render these corporate defendants directly liable for punitive damages.

135. The behavior and unethical conduct of Swedenburg was known to Bankers Life when she was promoted to Unit Field Trainer in Roanoke, January 1, 2016.

136. Prior to moving to Virginia, she had been investigated for unethical conduct in selling insurance in Indiana.

137. Further, customer complaints came to the defendants' home office about Swedenburg, regarding her work in Indiana, and early work in Virginia.

138. Throughout her employment in Roanoke, clients began to complain about her conduct, including allegations that she applied for policies without client permission; took checks from clients who didn't wish to apply for policies, etc.

139. As early as September 2016 (prior to the issuance of the Life Insurance policy at issue) Cole and Kyle Elliott were aware of these unethical conduct allegations against Swedenburg.

140. No less than five formal investigations were launched by the Bankers Life home office into her sharp practices and dealings with clients while she was employed in Roanoke.

141. Rather than disciplining Swedenburg, re-training or firing her, Bankers Life merely encouraged her to "slow down" while allowing their top producer to continue using fraudulent and sharp sales tactics across the region.

142. In sum, the defendants' utter disregard for their clients or perspective clients was reckless and willful.

143. Had Bankers Life prohibited Swedenburg from selling additional policies once client complaints were made, Mr. Breedlove would not be stuck with a life insurance policy he does not want. In fact, if they had called him to tell him she had been fired, after the firing, and not let the application go through, he would be without damages as they relate to the life insurance policy.

144. The defendants actions were willful, wanton, and without regard for the safety, financial consequences and wellbeing of their clients including Mr. Breedlove.

145. The plaintiff suffered damages in the form of funds expended for a Bankers insurance policy that was of no use to him.

146. As a result of the defendants' actions, the plaintiff suffered and will continue to suffer financial harm.

147. As a direct and proximate result of the willful, wanton, and/or reckless conduct of defendants and their staff, the plaintiff sustained financial harm and attorney's fees.

Wherefore, the plaintiff moves the Court for judgment against the defendants for compensatory damages in the amount of $250,000 (TWO HUNDRED AND FIFTY THOUSAND DOLLARS), and punitive damages in the amount of $350,000, plus those damages permitted by Virginia Code, namely actual damages, reasonable attorney's fees, and costs.

Trial by jury is requested.

By   s/ Lauren Ellerman
       Of Counsel

Lauren M. Ellerman, Esq. (VSB #68464)
Thomas D. Frith, IV, Esq. (VSB #90058)
FRITH ELLERMAN & DAVIS LAW FIRM, PC
P. O. Box 8248
Roanoke, VA 24014
Telephone: (540) 985-0098
Facsimile: (540) 985-9198
LEllerman@frithlawfirm.com
BFrith@frithlawfirm.com
*Counsel for the plaintiff*

